IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALANA WIRT** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 23-4949** |
| | : | |
| **VEEVA SYSTEMS, INC.** | : | |

**McHUGH, J.**                                                                                         **May 29, 2025**

## MEMORANDUM

After working in sales at Veeva Systems for over four years, Plaintiff Alana Wirt was terminated in March 2023, something she did not expect. She now sues Veeva, alleging that her termination was based on her gender and a medical condition Veeva did not accommodate. As to the former, she makes broad-sweeping allegations about Veeva's "boys club culture" and male-dominated leadership. As to the latter, she claims she was stigmatized for her inability to engage in the company's late night party culture. But there is undisputed evidence that she was consistently ranked near the bottom of her sales group, and she fails to identify any specific evidence of discrimination based on a protected characteristic. Because no reasonable jury could on this record infer either unlawful discrimination or a failure to reasonably accommodate her disability, Veeva is entitled to summary judgment.

**I.      Relevant Facts**

Veeva Systems ("Veeva") is a tech company that develops and sells cloud-based software for life sciences and consumer product industries. In 2018, Veeva hired Plaintiff Alana Wirt as a sales account executive, recruiting her from a different company. Offer Letter, ECF 19-5; Wirt Dep. 63:20-64:3, 65:14-19, ECF 19-3.

During her entire tenure at Veeva, Ms. Wirt worked remotely, visiting her clients in-person as needed. Wirt Dep. 74:20-78:11. There were, however, several large in-person Veeva events that Ms. Wirt ordinarily attended. At the beginning of each year, Veeva hosted a three-day field kickoff conference for all their sales and services staff, featuring various workshops and conference sessions. *Id.* 147:2-148:15; Smith Dep. 10:15-16:13, ECF 19-8. In the fall, Veeva hosted a two-day Summit attended by approximately 2,000 Veeva customers and employees. Smith Dep. 16:15-20:11. And a few times a year, sales teams met for Quarterly Business Reviews ("QBRs"), where account partners updated each other on their account plans, goals, and progress. *Id.* 20:12-21:12. At these in-person events, many attendees stayed out late in the evenings, socializing and drinking.

### A. The Impact of COVID-19 on Veeva's Policies.

Like most workplaces, Veeva shut down its offices and ceased most in-person work events during the COVID-19 pandemic. Wirt Dep. 75:15-76:25. In early 2022, Veeva began to allow employees to return to their offices. *Id.* But to address the continued risk of COVID-19, Veeva adopted a temporary vaccine mandate, requiring sales employees – even those who primarily worked remotely like Ms. Wirt – to be vaccinated. *Id.* 75:15-77:12. Ms. Wirt, who suffers from Hashimoto's thyroiditis, requested a medical exemption from Veeva's vaccine mandate, supported by a letter from a physician.[1] *Id.* 170:1-171:5; Physician Letter, ECF 19-6. After submitting the request and medical note to Veeva human resources in February 2022, Ms. Wirt's supervisors told her that she couldn't physically enter the office, but that she would not be disciplined for remaining

---

[1] Ms. Wirt's primary care physician recommended that she obtain a COVID-19 vaccine, but she pursued a second "unbiased opinion" from a physician who was recommended for his "nonmedical, non-pharmaceutical intervention." *Id.* 172:10-174:13.

2

unvaccinated due to her medical condition. Wirt Dep. 176:3-177:19. Ms. Wirt never formally heard back from human resources about her exemption. *Id.* But she personally does not appear to have followed up with human resources, trusting her supervisors' determination that she could remain unvaccinated due to her condition. *Id.* Significantly, Ms. Wirt was never disciplined, demoted, denied a promotion, or experienced a pay decrease because of her vaccination status. *Id.* 179:19-180:4. She attended her team's first 2022 QBR, located nearby in Radnor, Pennsylvania, remotely.[2] *Id.* 133:25-134:11. She was invited to attend the off-site QBR team dinner and go-kart outing connected to that event, but chose not to. *Id.* 171:3-17. In fact, for the second 2022 QBR, Veeva rented an off-site office space so that Wirt could attend in-person and "build camaraderie" with her team, circumventing the vaccination policy that only applied to Veeva's own offices. *Id.* 134:12-23.

Veeva lifted its vaccine mandate in June or July 2022. *Id.* 77:9-10, 159:24-160:1. Ms. Wirt continued to work remotely as she had since joining Veeva; the only difference was that she could now enter Veeva's offices. *Id.* 180:5-15, 160:2-5.

**B. Ms. Wirt's Roles and Performance at Veeva.**

At Veeva, Ms. Wirt initially worked on the Clinical Data Management Services (CDMS) team, selling a single Veeva product to both new and existing Veeva customers. Wirt Dep. 72:17-73:18, 78:19-79:17. Starting in late 2021 Ms. Wirt began selling Veeva's full suite of R&D applications. *Id.* 72:17-79:17. In February 2022 the entire CDMS team merged into Veeva's R&D sales department and Ms. Wirt became an account partner on an R&D sales team managed by

---

[2] One other member of Ms. Wirt's team also attended this meeting remotely. *Id.* 134:7-11.

Adam De Oliveira. *Id.* In R&D, Ms. Wirt was responsible for selling every Veeva product. *Id.* 79:3-9; Compl. ¶ 12, ECF 1.

This transition was difficult – she acknowledges that being responsible for so many new products overwhelmed her. Wirt Dep. 228:3-229:17. Adam De Oliveira, her R&D manager at the time, noticed this, claiming that "she struggled also with [] the sheer volume of products that we have to sell . . . it was a lot more to manage, a lot more complex, and she struggled with that." De Oliveira Dep. 37:8-13, ECF 19-7. According to Mr. De Oliveira, Ms. Wirt was still uncomfortable with the large number of products after a year on the team. De Oliveira Dep. 64:1-7. At her December 2022 Check-In, Mr. De Oliveira specifically wrote that "Alana wants to get more confident talking about Vault across the enterprise"). *Id.* Ex. 2.

Ms. Wirt appears to have struggled in R&D in other ways as well. Mr. De Oliveira believed that she was overwhelmed with the normal account partner workload, and as a result, he assigned some of her work to other partners to make it more manageable. *Id.* 36:8-10, 62:22-25. Ms. Wirt also struggled with a core aspect of working in sales at Veeva – generating new leads, also called "hunting" in industry terms. According to De Oliveira, Ms. Wirt "wasn't prospecting, she wasn't hunting, she was mostly just responding to whatever was going on with her accounts, which was good, but not good enough. Like, I really needed her to do more." De Oliveira Dep. 36:11-15. As a result, her sales pipeline was "absolutely" below average. *Id.* 58:6. In her deposition, Ms. Wirt confirmed that she spent most of her time in 2022 and 2023 managing existing accounts, not prospecting new business. Wirt Dep. 82:23-83:5; *see also id.* 227:2-23 (after discussing feeling overwhelmed, Ms. Wirt was tasked with focusing on existing accounts in 2023 and having other account partners do more prospecting).

In addition, De Oliveira concluded that he "could not trust her [sales] forecasts at all," De Oliveira Dep. at 42:18-23, which was concerning because account partners' forecasts feed into Veeva's external projections to Wall Street. *Id.* 68:1-4. Mr. De Oliveira found Ms. Wirt's forecasts to be "painful, because she forecasted really high. So basically, she would say that she would have very high revenue and then come way, way, way below the forecast." De Oliveira Dep. 42:18-25. This is corroborated by Ms. Wirt's July 5, 2022 check-in, where it was addressed as a deficiency. De Oliveira Dep. 38:23-25; *see id.* Ex. 1.

Ms. Wirt's struggles led to her receiving low "stack rankings" – holistic internal evaluations of employees that generated a ranking matrix of all employees in each group.[3] Every six months, supervisors created a stack-ranking of their group. Levy Dep. 33:2-12. Stack rankings for Ms. Wirt and others in her sales group were created by Erik Smith, Vice President of R&D and Quality at Veeva, who had monthly one-on-one meetings with Ms. Wirt. Wirt Dep. 176:24-25; Smith Dep. 31:13-44:10. Smith's rankings were informed by various factors, including forecast accuracy, administrative management, and renewals. Smith Dep. 31:13-44:10. Ms. Wirt was consistently ranked near the bottom of her group. *See* Smith Dep. Ex. 2 (undated spreadsheets of performance rankings); Levy Dep. Ex. 2 at p. 46 (ranking history document showing Wirt ranked 39th of 43 employees in her group in April 2019, 45th of 49 in October 2019, 37th of 46 in April 2020, 50th of 58 in October 2020, 10th of 10 in April 2021, 52nd of 55 in October 2021, 49th of 53 in April 2022, 61st of 64 in October 2022, and 35th of 35 in April 2023).

---

[3] It is unclear how a "group" was defined, but each group appears to be significantly larger than a single sales team.

Ms. Wirt's two 2022 check-ins with her manager were more favorable than would be expected from her low stack ratings that same year. Her manager rated her as "green" for engagement and status. De Oliveira Dep. Exs. 1-2. According to De Oliveira, he was "a little too generous" with his check-in reviews, in part because he "didn't want to lose her" as his team at the time was severely short-staffed and "[i]t would have been catastrophic" to lose another employee. *Id.* 40:1-22. R&D President Henry Levy testified that since De Oliveira knew Ms. Wirt had a low stack ranking, she should not have received a green in her check-in, and that the reviews were "bad execution by a manager." Levy Dep. 88:2-14. But even with that positive feedback, other comments in the reviews reflected that there needed to be improvement in forecast accuracy and that, as of December 2022, Ms. Wirt still was not fully comfortable talking about all Veeva's products and needed to improve. *See id.* 42:15-46:7, Exs. 1-2.

In February 2023, Ms. Wirt was transferred to a different R&D team, under newly-promoted manager Abbe Macbeth. Wirt Dep. 74:13-16; Macbeth Dep. 26:10-17, ECF 19-9. Shortly before Macbeth officially became a manager, she was approached by R&D Vice President Erik Smith and R&D President Henry Levy. They expressed concerns about Ms. Wirt's work performance, particularly her strategic thinking, partnership with clients, and ability to bring in new clients and generate new business within existing clients. Macbeth Dep. 27:14-30:13. Upon becoming Ms. Wirt's manager, Macbeth observed that Ms. Wirt was having difficulty getting in front of clients, was not being strategic, and was not responding to feedback. *Id.* 47:2-49:16. Both Macbeth and Smith found Ms. Wirt's March 2023 QBR presentation on her annual plan and projections to be lacking and provided Wirt with specific feedback on how to improve. Macbeth Dep. 48:15-22, 56:18-58:12; Smith Dep. 44:16-46:16. In Smith's view, Wirt did not follow through. Smith Dep. 46:10-16.

6

In late March 2023, Erik Smith and Henry Levy made the decision to terminate Ms. Wirt. Smith Dep. 47:2-11; Levy Dep. 86:23-87:5. Abbe Macbeth broke the news to Ms. Wirt, but was not involved in the decision to fire her. Smith Dep. 47:2-11; Macbeth Dep. 49:23-52-14. Macbeth did, however, agree with this decision, believing that Ms. Wirt was not performing at the same level as other account partners. Macbeth Dep 54:13-23.

Ms. Wirt brings her claims under Title VII, the ADA, and the PHRA, alleging that her termination amounts to discrimination on the basis of sex and disability. Ms. Wirt also alleges that Veeva failed to accommodate her disability under the ADA. Veeva has moved for summary judgment on all counts.

## II. Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. Discussion

The *McDonnell Douglas* burden-shifting framework applies to Title VII and ADA discrimination claims grounded on pretext rather than direct evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 69 (3d Cir. 1996) (applying the *McDonnell Douglas* framework to ADA cases). Under this framework, a plaintiff must first establish a *prima facie* case of unlawful conduct. *McDonnell Douglas*, 411 U.S. at 802. If a *prima facie* case is established, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection [or termination]." *Id*. The employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment

7

decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If an employer meets this burden, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Id.*

### A. Title VII Sex Discrimination

Title VII prohibits employers from discriminating against or terminating employees "because of" their sex. 42 U.S.C. § 2000e-2(a)(1). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-12 (3d Cir. 1999). Ms. Wirt has not satisfied the fourth element because she has not pointed to any evidence that a jury could reasonably infer amounts to sex discrimination.

In support of her sex discrimination claim, Ms. Wirt repeatedly identifies workplace events and outings that she describes as "inappropriate." But Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted). The things Ms. Wirt describes – work-sponsored alcohol consumption, mature comedy shows, an outing to a bar with sexualized artwork, and a work-organized Cirque du Soleil style performance – do not by themselves violate Title VII, even if they made her uncomfortable at times.

Title VII prohibits employment discrimination on the basis of sex. Generalized allegations about Veeva's workplace culture form a substantial basis of Ms. Wirt's claims but fail to establish that she was terminated because of her sex. According to Ms. Wirt, Veeva is "male-dominated" without "a lot of women in leadership" because "leadership opportunities were available strictly to men." Wirt Dep. 101:16-102:8. But Ms. Wirt does not know how many men and women were

in Veeva's leadership or provide evidence of specific hiring practices that discriminated against women.[4] Wirt Dep. 142:14-146:20. In fact, Ms. Wirt acknowledges that her female manager, Abbe Macbeth, told Wirt that she had been promoted to manager because Veeva was trying to get more women in leadership. Wirt Dep. 143:4-7. *Id.* 101:20-21. Similarly, Ms. Wirt repeatedly cites to a "boys club culture" perpetuated by Veeva, and alleges that her female manager Macbeth encouraged this behavior because Macbeth "was very much about going out and having fun." *Id.* 182:17-18. But Ms. Wirt fails to articulate how a culture of both male and female employees "going out and having fun" amounts to discrimination "because of" sex in violation of Title VII.

One of the specific examples Ms. Wirt cites involves a comment made to her by a male executive. At a formal dinner during Veeva's Orlando Summit, Executive Vice President of Global Sales Alan Mateo said "oh, that's a really nice dress" to Ms. Wirt and looked at her. Wirt Dep. 148:24-149:6. The two then made small talk about how the event was going. *Id*. at 149:18-150:25. A single comment about an article of clothing, devoid of reference to Ms. Wirt's figure or personal appearance, does not create an inference of sex discrimination or hostility. And Ms. Wirt does not recall any other inappropriate comments or behavior directed at her that could collectively lead a jury to infer that she was terminated because of her sex, a subject defense counsel explored at length in her deposition. *See, e.g., id.* 261:4-12, 270:5-9 (Ms. Wirt doesn't recall any inappropriate sexual comments happening at the 2019 or 2020 kickoff or Summit events); *id.* 110:21-111:18, 114:9-11, 116:10-12 (nobody made inappropriate comments to her at the Fall 2022

---

[4] Ms. Wirt alleges that the company culture is "to hire very young, hungry college graduates," a practice in no way prohibited by Title VII because college graduates include women. *Id.* 101:20-21. And Ms. Wirt has not brought suit under the Age Discrimination in Employment Act, which forbids employers from discriminating against individuals over 40 years old. *See* 29 U.S.C. §§ 621, *et seq*.

9

Boston Summit); *id.* 135:18-20 (nobody made inappropriate comments to her at the 2022 Raleigh QBR); *id.* 137:5-8 (Ms. Wirt doesn't recall any inappropriate comments made to her at the 2022 New York QBR); *id.* 151:15-153:3 (other than Alan Mateo's comment about her dress, nobody made inappropriate comments to Ms. Wirt at the 2023 Orlando Summit); *id.* 191:17-19, 196:13-25, 203:24-204:2 (no inappropriate comments were made at the 2023 New York QBR first night dinner and outing); *id.* 209:24-215:14 (no inappropriate comments made during the second night of the 2023 New York QBR, but a coworker took inappropriate photo standing behind a sexualized statute of an animal, *see* ECF 23-10, and another coworker bought Ms. Wirt "good champagne" after she said the champagne she was drinking was "not very good," despite her declining).

In further support of her claim of sex discrimination, Ms. Wirt cites a situation of which she was vaguely aware involving a male Veeva employee who was "terminated because of comments [he] made that were sexual in matter." Wirt Dep. 103:14-104:12, 152:6-25, 111:2-112:18. These comments were not directed at Ms. Wirt or made in front of her, and this employee was "promptly removed" from his job. *Id.* This second-hand narrative of another employee's inappropriate behavior hardly supports a reasonable inference that Ms. Wirt was terminated because of her sex. If it supports any inference, it would seem to be that Veeva did not tolerate that employee's sexually inappropriate conduct.

In sum, Ms. Wirt provides no evidence that would allow a jury to reasonably infer that her termination amounted to discrimination on the basis of sex. As such, Veeva's motion for summary judgment must be granted.

**B. ADA Claims**

Ms. Wirt further asserts that Veeva violated her rights under the ADA both by discriminating against her on the basis of her disability and by failing to accommodate her disability. Compl. ¶ 27, ECF 1.

*1. Disability Discrimination*

To establish a *prima facie* case of disability discrimination, Ms. Wirt must show "(1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of the discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

The parties do not dispute that Ms. Wirt suffers from a qualifying disability – Hashimoto's thyroiditis – or that she is generally qualified for the position. Instead, Veeva claims that Plaintiff fails on the third element because the supervisors responsible for Plaintiff's termination were not aware that she suffered from Hashimoto's disease. "[T]o establish discrimination because of a disability, an employer must *know* of the disability." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (emphasis added) (an employer did not have knowledge of an employee's asthma when the employer only was aware of the employee's prior, temporary pneumonia). This follows from the language of the statute, which defines unlawful discrimination by an employer as "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability . . ." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). In analyzing disability discrimination cases, "[t]he knowledge of other employees should not be imputed to those responsible for making the [employment] decision at issue." *Curran v. Se.*

*Pennsylvania Transp. Auth.*, No. 13-5919, 2015 WL 1542290, at *6 (E.D. Pa. Apr. 7, 2015) (McHugh, J.) (citing *Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 954 (3d Cir. 1996)).

Ms. Wirt testifies that she *assumed* human resources told her managers and other superiors about her disability but did not actually know if they were so informed. Wirt Dep. 127:17-28:8. Ms. Wirt also informed multiple managers and supervisors, including Erik Smith, that her medical condition prevented her from staying "out super late." Wirt Dep. 261:13-262:23. The other evidence of record strongly suggests that neither Ms. Wirt's direct supervisors nor anyone involved in the decision to terminate her knew that she suffered from Hashimoto's disease. *See* Macbeth Dep. 38:3-39:9 (Macbeth knew that Ms. Wirt was unvaccinated, but didn't know she had received an exemption or had any medical conditions); Smith Dep. 48:3-49:7 (Smith knew that Ms. Wirt had a medical condition and was exempt from the vaccine, but did not know what the medical condition was or if she received any other accommodations); Levy Dep. 69:1-70:15 (Levy knew Ms. Wirt had a vaccine exemption, but didn't know what her medical condition was or whether she had made any other accommodation requests); De Oliveira Dep. 30:20-34:1 (Ms. Wirt had told him she was exempt from the COVID-19 vaccine, but he was not aware she had a medical condition).

Critically, the two supervisors ultimately responsible for Ms. Wirt's termination – Erik Smith and Henry Levy – were aware that Ms. Wirt had *some* medical condition that prevented her from being vaccinated and entitled her to an exemption. And Smith was allegedly aware that this medical condition prevented Ms. Wirt from staying out very late. For summary judgment purposes, this suffices as evidence of the knowledge requirement. To require the terminating supervisors to know the precise medical diagnosis would contravene Congress's clear intent to

12

protect the confidentiality of medical information and limit the disclosure of such information. *See* 42 U.S.C. §§ 12112(d)(3)-(4).[5] Veeva does not prevail as to this argument.

But Ms. Wirt still fails to establish the third element because she does not plausibly show that Veeva terminated her *because of* her medical condition. To establish a *prima facie* case of discrimination, a plaintiff must "prove that [her] disability was a determinative factor in the Company's decision to terminate [her]." *Kairys v. S. Pines Trucking, Inc.*, 75 F.4th 153, 161 (3d Cir. 2023) (internal citation omitted).

First, Ms. Wirt points to no evidence linking her vaccine accommodation with her termination. Plaintiff's termination occurred more than a year after her original accommodation request, and some eight months after Veeva ended their vaccination mandate.[6] Ms. Wirt discusses how in Spring 2022, some of her coworkers who supported Veeva's decision to require exempt unvaccinated employees to be remote, "tried to avoid her," and fellow team member Abbe Macbeth allegedly told another coworker "I can't believe she's not vaccinated." Wirt Dep. 159:6-15, 164:4-21. Though this may well have impacted Ms. Wirt emotionally, none of these comments give rise to a reasonable inference that, almost a year later, Erik Smith and Henry Levy decided to

---

[5] While an employer may inquire whether an employee has a disability for a job-related purpose, such as for a requested accommodation, 42 U.S.C. § 12112(d)(4), such information is confidential and must be maintained in separate medical files. *Id.* § 12112(d)(3)(B). Though supervisors and managers "*may* be informed [of confidential medical records] regarding . . . necessary accommodations," there is no requirement that they be informed of the specific medical conditions. *Id.* § 12112(d)(3)(B)(i) (emphasis added).

[6] For ADA retaliation claims, an "unusually suggestive" temporal proximity between an employee engaging in a protected activity and termination can support a finding of causation. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003). Even if I were to import this standard into an ADA claim of discrimination, a 14-month gap between the request for accommodations and termination is far too large to establish temporal proximity, especially when the vaccine mandate necessitating the accommodation was discontinued more than eight months prior the termination.

terminate her because of her vaccine accommodation or medical condition.  Indeed, Plaintiff admits that she was never disciplined, demoted, denied a promotion, or experienced a pay decrease because of her vaccination status.  *Id*. 179:19-180:4. And in one instance a meeting was convened offsite specifically so that she could participate.

Plaintiff additionally alleges that she was terminated because her condition made it difficult to stay up late and "fully participate in Defendant's party culture." Pl. Resp. at 12, ECF 23.  While the record establishes that late night socializing and drinking took place at Veeva's semiannual staff gatherings, no evidence demonstrates that such activities were mandatory or that Ms. Wirt's failure to participate in these activities due to her Hashimoto thyroiditis led to her termination.

Ms. Wirt emphasizes that she felt as if she had to stay out late, yet fails to cite a single time she was told to stay late at an evening event or chastised for leaving early.[7] When she left evening events, Ms. Wirt's colleagues would sometimes make comments encouraging her to continue socializing.  But Ms. Wirt admits that some of these comments were made because "they just wanted to spend time with me because I don't get to spend much time with my coworkers outside of the work environment." Wirt Dep. 207:16-208:7. No reasonable jury would infer from these

---

[7] *See, e.g.,* Wirt Dep. 107:2-109:25, 120:1-124:11 (Wirt left early each Fall 2022 Summit evening without issues, and other employees often left for the evening with her); *id.* 128:22-24 (Abbe Macbeth never told Wirt to stay out late); *id.* 206:10-208:18 (Wirt decided to follow Erik Smith's lead and head back to the hotel before most of the group at the 2023 March QBR); *id.* 135:24-136:8 (nobody made comments when Wirt did not go out for dinner and drinks in the Spring 2022 QBR); *id.* 137:17-20 (nobody commented about Wirt not attending after-dinner drinks or parties at the third quarter QBR in 2022); *id.* 153:4-22 (Ms. Wirt left immediately after dinner at the 2023 Orlando Summit, and Henry asked, "leaving so soon?" but didn't say anything else).  She further concedes that some of her superiors – including the one who made the decision to terminate her – also declined to partake in evening activities. *Id.* 206:10-208:18 (Erik Smith was the first to leave an evening event).  Others in management also claim to not attend late events.  Levy Dep. at 73:1-74:2 (he was an "introvert" and was often the first to leave evening events); De Oliveira Dep. 20:6-21:22 (he always goes back to his room early and does not attend late events).

friendly overtures that Ms. Wirt was required to attend such events or conclude that she was terminated because of her medical condition.

The record also lacks evidence that Ms. Wirt was required to drink alcohol. Her own testimony reveals that drinking was her own choice. Wirt Dep. 139:23-140:19. And numerous witnesses testified that alcohol consumption was not a job requirement, and in many respects Veeva sought to discourage it. Smith Dep. 50:12-51:2 (account partners are required to talk with their clients, but do not have to drink); Levy Dep. 64:16-65:17 (drinking is not mandatory, and though some sales staff use drinking to connect with clients, many sales staff find alternative relationship-building activities). In fact, managers testified that excessive drinking during work conferences was frowned upon and Veeva took steps to curb alcohol consumption. De Oliveira Dep. 20:19-25 (describing Veeva's alcohol policy limiting staff to two alcoholic beverages at the Veeva Summit and saying he hasn't seen any of his employees go over the limit); Mateo Dep. 40:5-17, ECF 19-11 (at the Summit, leadership discusses Veeva's alcohol policy with account partners and makes it clear that "drinking until all hours of the evening . . . was not considered acceptable behavior"); Levy Dep. 55:2-57:15, 66:4-23 (describing Veeva's alcohol policy, initiated by Veeva's sober CEO who felt strongly about the issue, which included ceasing alcohol service at 9:30 p.m. and serving half glasses of wine. Veeva maintained this policy despite some client dissatisfaction).

Once again, Ms. Wirt lacks evidence that Veeva required account partners to stay out late and drink alcohol. Nor is there evidence that Ms. Wirt's reduced participation in these events due to her Hashimoto's disease was causally linked to Veeva's decision to terminate her.

ADA plaintiffs must show that their disability "played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process." *New*

15

*Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (citations omitted). Based on the dearth of evidence on the record to this effect, I am persuaded that no reasonable jury could find that Plaintiff has met this standard.

### 2. Failure to Accommodate

The ADA requires employers to provide disabled employees with reasonable accommodations that will permit the employee to keep their job. 42 U.S.C. § 12112(b)(5). To establish a *prima facie* failure to accommodate claim, a plaintiff must show that (1) she was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

Under the first element, an employer's duty to provide such an accommodation is only triggered when the employee makes a request for an accommodation. *Jones v. United Parcel Service*, 214 F.3d 402, 408 (3d Cir. 2000) (affirming grant of summary judgment because plaintiff "never requested an accommodation or assistance for his disability."); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506-07 (3d Cir. 2010). "The employer must have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (quoting *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)). Such a request does not need to use any "magic words," but a request "must make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313.

During her tenure at Veeva, Ms. Wirt requested one ADA accommodation – an exemption from its COVID-19 vaccine mandate.  Veeva did not insist that she get the vaccine.  Rather, for the six months that Veeva's vaccine mandate was in effect, Ms. Wirt was not allowed to enter Veeva offices, but instead continued to work remotely and zoom into meetings.  This accommodation was exceedingly reasonable because Ms. Wirt was already a remote employee who only went into the office twice a year.  Wirt Dep. 75:6-10.  Further, Veeva went to the extra expense of renting an off-site conference room to house her team's May 2022 QBR for the sole purpose of allowing Ms. Wirt an opportunity to be in-person with her team.  Wirt Dep. 131:3-133:7. In light of the health risks of COVID-19 that time, no jury could conclude that Veeva's temporary ban on her entry into its offices was unreasonable.

Construing Ms. Wirt's complaint broadly, she also appears to allege that Veeva failed to accommodate her Hashimoto's disease at the evening social events accompanying Veeva's few in-person gatherings each year.  But as also discussed above, Ms. Wirt was never required by Veeva to stay out late at conferences.[8]  *See* Wirt Dep. 105:18-106:3 (was told to be visible to clients at the Summit but was not told she had to be with them the entire time they were out); *id.* 128:22-129:7 (Abbe Macbeth never told her to stay out late, but Wirt felt like she had to "to make a good impression"); *id.* 153:6-154:20 (Henry said "leaving so soon" one evening, but never told her she needed to stay).  Ms. Wirt does not claim she requested to skip or leave evening events

---

[8] Ms. Wirt says it was "implied" through company culture that she was required stay out late.  Wirt Dep. 108:1-9, 129:24-25, 129:16-19, 154:17-155:2.  And though Ms. Wirt may have subjectively believed this, nothing on the record would allow a reasonable jury to conclude that such a requirement actually existed and that Ms. Wirt would have been penalized for going home early, as she – and several of her supervisors – frequently did.

early and was not permitted to. Nor does she allege that she requested any other accommodation related to evening events.

Nor do other witnesses support a claim. Levy Dep. at 73:1-74:2 (Levy, an introvert, was often the first to leave evening events, and while sales staff were expected to build client relationships during daytime sessions, they were not required to attend evening events because they "are not mandatory" and he would never "tell somebody to stay longer"); De Oliveira Dep. 18:19-21:22 (account partners could return to their room in the evening. De Oliveira always skipped evening activities).

Ms. Wirt did inform multiple managers and supervisors that she had a medical condition that prevented her from staying "out super late," Wirt Dep. 261:13-262:23, but that is not she same as requesting an accommodation. No reasonable jury could find that such a comment would, standing alone, cause a reasonable employer "to make appropriate inquiries about the possible need for an accommodation," especially where the events at issue were voluntary gatherings unrelated to work performance that many non-disabled employees also skipped or left early. *Conneen*, 334 F.3d at 332. This limited evidence is insufficient to establish the first element of her failure to accommodate claim.

### C.  PHRA Claims

Ms. Wirt has also filed closely related claims of sex and disability discrimination, as well as a failure to accommodate her disability, under the Pennsylvania Human Relations Act ("PHRA").

"The PHRA is basically the same as the ADA in relevant respects 'and Pennsylvania courts [] generally interpret the PHRA in accord with its federal counterparts.'" *Rinehimer*, 292 F.3d at 382 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). The resolution of

Plaintiff's ADA claims therefore also disposes of her PHRA claims. Similarly, Ms. Wirt's PHRA sex discrimination claims are evaluated under the same framework as Title VII. *See Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995) (noting that PHRA and Title VII are interpreted similarly), *cert. denied*, 518 U.S. 1005 (1996); *Powell-Folks v. Villanova Univ.*, No. 24-5065, 2025 WL 756538, at *2 (E.D. Pa. Mar. 10, 2025) (McHugh, J.) (analyzing Title VII and PHRA hostile work environment claims under the same framework).

As such, I will also grant Defendant's Motion for Summary Judgment as to Plaintiff's PHRA claims.

**IV. Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted. An appropriate order follows.

 /s/ Gerald Austin McHugh   
United States District Judge
